# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | | |
|---|---|---|
| **CHARLIE FRANKIE BUTLER** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:  2:14-CV-01746-MHH** |
| | ) | |
| **MERCEDES-BENZ U.S.** | ) | |
| **INTERNATIONAL, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Charlie Butler works for defendant Mercedes-Benz U.S. International, Inc. ("MBUSI") as a team leader in MBUSI's paint shop in Vance, Alabama.  According to Mr. Butler, MBUSI gave him unfavorable performance evaluations and failed to promote him because he is African-American.  Mr. Butler asserts race discrimination claims against MBUSI under Title VII of the Civil Rights Act of 1964 and Section 1981 of the Civil Rights Act of 1866.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, MBUSI asks the Court to enter judgment in its favor on Mr. Butler's discrimination claims. (Doc. 40).  MBUSI also asks this Court to strike portions of the declaration Mr. Butler submitted in response to the company's motion for summary judgment. (Doc. 52).  For the reasons explained below, the Court grants in part and denies in

part MBUSI's motion to strike, and the Court grants MBUSI's motion for summary judgment.

## I.   SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).  When considering a summary judgment motion, the Court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party.  *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015).  The Court describes the evidence in the summary judgment record accordingly.

## II.   RELEVANT FACTUAL BACKROUND

### A.   MBUSI and its Evaluation and Promotion Policies

MBUSI manufactures automobiles in Vance, Alabama.  (*See* Doc. 39-6, ¶ 2).  MBUSI's production facility includes a body shop, assembly shop, and paint shop.  (Doc. 39-1, p. 60).  To staff the shops, MBUSI employs hourly production workers who are organized into teams under a team leader.  (*See* Doc. 39-11, ¶ 5).  Team leaders are hourly workers who perform production work and monitor and direct team members to ensure team members perform their work in an efficient, safe, and satisfactory manner.  (Doc. 39-3, p. 34; Doc. 39-4, pp. 18-19; Doc. 39-11, ¶ 5).  MBUSI does not categorize team leaders as managers or supervisors, and team leaders do not have authority to evaluate or discipline team members.  (Doc. 39-4, p. 19; Doc. 39-5, p. 17; Doc. 39-11, ¶ 5).

MBUSI's teams of production workers are organized into groups supervised by a group leader.  (*See* Doc. 39-5, pp. 21-23; Doc. 39-11, ¶ 4).  Group leaders are MBUSI's front-line supervisors, and each group leader supervises several teams of production workers.  (Doc. 39-11, ¶ 4).  Group leaders perform supervisory and managerial duties such as counseling and evaluating team leaders and team members.  (Doc. 39-4, pp. 19-20, 23-24; Doc. 39-11, ¶ 4).

Every year, group leaders evaluate the team members and team leaders in their group and complete an evaluation form for each employee.  (Doc. 39-3, p. 41;

Doc. 39-4, pp. 23-24; *see also* Doc. 39-2, pp. 7-18; Doc. 48-1, ¶ 5). To ensure consistency, a MBUSI manager, senior manager, and human resources representative must review and sign off on each evaluation form completed by a group leader. (Doc. 39-3, p. 41).

The evaluation and evaluation form for each team member or team leader consists of two parts: a performance evaluation and an appraisal regarding potential for promotion. (Doc. 39-7, ¶ 3; *see also* Doc. 39-2, pp. 20-21; Doc. 48-1, ¶ 5). For the performance evaluation, a group leader considers a team leader's job performance in ten specific areas and rates the team leader's performance in those areas as "S" for satisfactory or "N" for needs development or not satisfactory. (Doc. 39-2, pp. 7-17; Doc. 39-3, p. 24; Doc. 39-4, p. 33). The group leader then gives each team leader an overall performance rating of S or N. (Doc. 39-3, pp. 23-24). To earn an overall S rating, a team leader must receive fewer than two N's in the ten specific areas. (Doc. 39-2, p. 7). If a team leader receives two or more N's on a performance evaluation, then the team leader receives an overall rating of N. (Doc. 39-2, p. 7).[1]

A team member "must have an overall 'S' Performance Evaluation rating before a Potential Appraisal is completed." (Doc. 39-2, pp. 8, 10, 12, 14). For the

---

[1] Jeff Burbank, MBUSI's human resources manager, testified that the statement on MBUSI's performance evaluation form indicating that two N's results in an overall N rating is just a guideline and that in some circumstances, an employee may receive an overall S rating even if he or she receives two or more N's, but Mr. Burbank could not give an example of an employee or received two or more N's and an overall S rating. (Doc. 39-3, pp. 24-26).

potential for promotion appraisal, a group leader rates each team leader as "needs development" if the employee is not ready for a promotion or "ready" if the employee is ready for promotion to the next level. A group leader must explain the reasons for the rating. (Doc. 39-2, pp. 8-18).

According to MBUSI, "[p]romotions to group leader vacancies are highly competitive." (Doc. 39-6, ¶ 11). Before January 2013, MBUSI posted group leader vacancies by shop. (Doc. 39-3, pp. 56, 59; Doc. 39-6, ¶ 5). For example, if the paint shop had a vacancy for a group leader position, MBUSI posted the position only in the paint shop. (*See* Doc. 39-3, pp. 54, 56, 59). An interested team leader could apply for a posted group leader position, and MBUSI's human resources group compiled a list of eligible applicants. (*See* Doc. 39-3, pp. 59-60). To be eligible for a promotion to a group leader position between January 2010 and January 2013, an applicant had to be an MBUSI team leader in the shop with the opening for at least six months, have an overall rating of S on his or her most recent evaluation, and not have a current disciplinary action. (Doc. 39-3, pp. 60-61; Doc. 39-6, ¶ 6; Doc. 48-1, ¶ 7). If a team leader received an overall rating of N on his or her evaluation preceding the opening, then he or she was not eligible for a promotion. (Doc. 39-2, p. 24; Doc. 39-4, pp. 33-34).

Eligible applicants for a group leader position completed an assessment test for the position. (Doc. 39-3, pp. 57, 64-65; Doc. 39-6, ¶ 9). In addition, MBUSI

interviewed the applicants, solicited peer input about them, and completed a group leader assessment for each applicant. (Doc. 39-6, ¶ 9). As with a team leader's potential appraisal, for his interview, peer input, and group leader assessment, an applicant for a group leader position received an appraisal of "ready" or "needs development." (*See* Doc. 39-6, ¶ 6). If a team leader received two or more appraisals of "needs development" from those sources, then he or she could not be promoted. (Doc. 39-6, ¶ 6). A team leader could receive an appraisal of "needs development" on his or her most recent potential appraisal and still be eligible for promotion if the team leader received appraisals of "ready" in the interview, peer input, and group leader assessment. (*See* Doc. 39-6, ¶ 6). After evaluating the applicants for a group leader position, MBUSI placed the names of eligible applicants in a group leader candidate selection pool, and MBUSI's senior management would select an applicant from that pool to fill the vacant group leader position. (Doc. 39-6, ¶ 10).

MBUSI changed its promotion process in 2013 and began advertising group leader vacancies across the entire production facility so that a team leader in one shop could learn about and apply for a group leader position in a different shop. (Doc. 39-3, pp. 23, 55-56, 59, 60; Doc. 39-6, ¶ 7; Doc. 48-1, ¶ 8). MBUSI made the change "to open up more opportunities for [its] team leaders." (Doc. 39-3, pp. 55-56). Nevertheless, according to MBUSI, it generally only promoted team

leaders to group leader positions within the shop or department in which they worked. (Doc. 39-6, ¶ 7; Doc. 48-1, ¶ 8).

In 2013, MBUSI changed the requirements for team leader eligibility for promotion to a group leader position. (Doc. 39-6, ¶ 7). To be eligible for promotion, a team leader had to have been a team leader for at least six months, not have any current corrective action, and have an overall rating of S on his or her most recent performance evaluation. (Doc. 39-3, p. 60). In addition, beginning in 2013, a team leader had to have received a potential appraisal of "ready" on his or her most recent evaluation, and a team leader who had an appraisal of "needs development" could not be promoted to a group leader position. (Doc. 39-3, p. 62, 71). As before, eligible applicants for a group leader position had to complete an assessment test, and MBUSI evaluated applicants based on an interview, peer input, and group leader assessment. (*See* Doc. 39-6, ¶ 9).

### B.    Mr. Butler's Employment History with MBUSI and Evaluations

Mr. Butler began working at MBUSI in September 2001 as a production team member in the sealer group at MBUSI's paint shop. (Doc. 39-1, pp. 35-36, 59, 62; Doc. 48-1, ¶ 2). On June 6, 2005, MBUSI promoted Mr. Butler to a team leader position in the sealer group at the paint shop. (Doc. 39-1, pp. 61-62, 90; Doc. 39-2, p. 4). Mr. Butler remained in that position through the filing of this lawsuit. (Doc. 39-5, pp. 34-35; Doc. 48-1, ¶ 2). Mr. Butler has been in a team

leader position longer than any other current team leader at MBUSI.  (*See* Doc. 39-4, pp. 64-65; Doc. 48-1, ¶¶ 2, 23).

Over the years, several Caucasian male group leaders supervised Mr. Butler's work, including Kevin McCurley, Jody Pinion, Danny Stamps, and Toby Hicks.  (Doc. 48-1, ¶ 2).  During the relevant time period, Tim Smith, a Caucasian male, was the manager or senior manager of the paint shop and Mark Selby, an African-American male, was the department manager or assistant manager in the shop.  (Doc. 39-3, pp. 28-29; Doc. 39-10, ¶ 2; Doc. 39-11, ¶ 1).[2]  As the senior managers of the paint shop, Mr. Smith and Mr. Selby had to review and approve Mr. Butler's annual evaluations.  (Doc. 39-10, ¶ 3; Doc. 39-11, ¶ 6).

Mr. Butler routinely filled in for his group leader when the group leader was absent.  (Doc. 39-1, pp. 118, 130-33; Doc. 39-5, p. 38; Doc. 48-1, ¶ 3).  In particular, Mr. Butler filled in as a group leader for Mr. Stamps and Mr. McCurley on numerous occasions.[3]  Mr. Stamps testified that he approached Mr. Butler about filling in for him as group leader because "he could do the job."  (Doc. 39-5, pp. 39-40; Doc. 48-1, ¶ 3).  Mr. McCurley admitted that Mr. Butler did a good job when he filled in as group leader.  (Doc. 39-4, p. 58).

---

[2] Mr. Selby's title changed from assistant manager to department manager, but his job duties remained the same.  (*See* Doc. 39-10, ¶ 2, n.1).  Likewise, Mr. Smith's title changed from manager to senior manager, but his duties remained the same.  (Doc. 39-11, ¶ 2, n.1).

[3] Mr. Stamps testified that Mr. Butler filled in for him approximately five to ten times per year over two years.  (Doc. 39-5, p. 39).  Mr. McCurley testified that Mr. Butler filled in for him between ten and fifteen times.  (Doc. 39-4, p. 59).

Mr. McCurley became Mr. Butler's group leader in 2009. (*See* Doc. 39-1, p. 85; Doc. 39-1, ¶ 4). On September 16, 2009, Mr. McCurley evaluated Mr. Butler. (Doc. 39-2, p. 13-14). Mr. McCurley rated Mr. Butler's performance as satisfactory in all areas, and he appraised Mr. Butler as ready for promotion. (Doc. 39-2, pp. 13-14). After receiving the appraisal rating him as ready for promotion, Mr. Butler applied for an open group leader position in July 2010, and he completed the group leader assessment test for the position. (*See* Doc. 39-1, pp. 217-18; Doc. 39-2, p. 34; Doc. 39-6, ¶ 3(d)). Ultimately, MBUSI did not fill the open group leader position in July 2010. (Doc. 39-6, ¶ 3(d)).[4]

Jody Pinion became Mr. Butler's group leader in 2010, and Mr. Pinion evaluated Mr. Butler on September 23, 2010. (Doc. 39-13). Mr. Pinion rated Mr. Butler's performance as satisfactory in all areas, and he appraised Mr. Butler as ready for promotion. (Doc. 39-13, pp. 1-2). Mr. Stamps then became Mr. Butler's group leader, and he evaluated Mr. Butler on September 27, 2011. (Doc. 39-2, pp. 15-16). In the 2011 evaluation, Mr. Stamps rated Mr. Butler's job performance as satisfactory in all areas, and he appraised Mr. Butler as ready for promotion. (Doc. 39-2, pp. 15-16).

Although Mr. Butler received appraisals of ready for promotion in September 2010 and 2011, MBUSI did not have any openings for a group leader

---

[4] The record does not reflect why MBUSI did not fill the position.

position in the paint shop during that time. Accordingly, Mr. Butler did not apply for a group leader position after his September 2010 and 2011 evaluations, and MBUSI did not promote any team leaders to a group leader position in the paint shop during that period. (*See* Doc. 48-1, ¶ 9).

Mr. Stamps evaluated Mr. Butler's performance again on September 29, 2012. (Doc. 39-2, pp. 17-18). In Mr. Butler's 2012 evaluation, Mr. Stamps rated Mr. Butler's job performance as satisfactory in all ten areas, but he noted that problem solving "is one area [Mr. Butler] needs to continue to develop . . . ." (Doc. 39-2, p. 17). Also, unlike in Mr. Butler's three prior evaluations, Mr. Stamps gave Mr. Butler a potential appraisal of "needs development," noting as follows:

> [Mr. Butler] needs to develop problem solving methods for issues that arise in his area [and] needs to develop a win-win attitude for issues that occur with other shift and operators in his area. [Mr. Butler] has the tools to be a group leader in the paint shop, but there are a few minor issues I would like [him] to work on over the next few months. I will develop a training plan and conduct another eval[uation] in Jan[uary] of 2013.

(Doc. 39-2, p. 18).[5] Mr. Selby, Mr. Smith, and Octave Roberts, an African-American team relations representative in MBUSI's human resources department,

---

[5] Mr. Stamps evaluated four other team leaders in 2012. (Doc. 39-8, ¶ 14). Mr. Stamps's evaluation of those four team leaders is summarized in the table below:

| Name | Race | Performance Evaluation | Potential Appraisal | Interested in a Promotion |
|------|------|------------------------|---------------------|---------------------------|
| Michael Grove | African-American | S | Needs Development | No |

reviewed and approved of Mr. Butler's 2012 evaluation, including the "needs development" appraisal. (Doc. 39-9, ¶¶ 1, 4; Doc. 39-10, ¶ 3; Doc. 39-11, ¶ 6).

Mr. Stamps testified that he appraised Mr. Butler as not ready for a promotion in part because of a note Mr. Butler wrote on August 20, 2102 and left for paint robot operators on a prior shift. (Doc. 39-5, pp. 50-52).[6] Mr. Butler wrote the note to the robot operators on a weekend shift stating that their work was "very ugly" and also stating in part:

> The car was looking good Friday. Why is it every time y'all operators come and do path work, the car end up worse than what it was??? Their short cuts kills [sic] us.

(Doc. 39-1, p. 164; Doc. 39-2, p. 19).

As a team leader, Mr. Butler had to ensure that team members performed their job duties according to MBUSI's policies and procedures and not take short cuts, so the advice that Mr. Butler provided fell within the scope of his duties. (Doc. 39-5, p. 48). Even so, Mr. Stamps thought that the "tone and tenor" of the comments in Mr. Butler's note were not appropriate and were "not reflective of the leadership ability necessary to be a group leader." (Doc. 39-8, ¶ 7; *see also* Doc.

| Theresa Pierson | Caucasian | S | Needs Development | No |
| Brian Avery | African-American | S | Ready | Yes |
| Jeremy Miller | Caucasian | S | Ready | Yes |

(Doc. 39-8, pp. 15-24).

[6] The paint robot operators are team members who operate robots that spray paint onto vehicles. (Doc. 39-1, pp. 71, 161).

39-5, p. 50).  Mr. Stamps talked with Mr. Butler about the note immediately after Mr. Butler wrote it, and Mr. Stamps told Mr. Butler he should not have written the note even though it was true.  (Doc. 39-1, p. 169).

According to Mr. Stamps, on a broader level, "Mr. Butler's interactions with co-workers had deteriorated" between 2011 and 2012.  (Doc. 39-8, ¶ 6).  In particular, Mr. Stamps contends that Mr. Butler did not communicate effectively with the paint robot operators, and the robot operators complained to Mr. Stamps "about the negative way Mr. Butler spoke to them."  (Doc. 39-8, ¶ 6).  For his part, Mr. Butler admitted that he and the robot operator on his team did not "see eye to eye."  (Doc. 39-1, pp. 129-30).

Mr. Butler testified that Mr. Stamps did not explain to him why he thought Mr. Butler was not ready for promotion.  (Doc. 39-1, pp. 151-52).  During an evaluation meeting, Mr. Stamps told Mr. Butler that because of his appraisal, if MBUSI had an open group leader position, the position would go to Jeremy Miller or Nate Long, two Caucasian team leaders, instead of Mr. Butler.  (Doc. 39-1, p. 153).  In addition, Mr. Stamps told Mr. Butler that he (Mr. Stamps), Mr. McCurley, and Mr. Pinion did not want T.J. Tripp, an African-American, in a group leader position, so they "got rid of him."  (Doc. 39-1, p. 155).[7]  Mr. Butler

---

[7] Mr. Tripp took a voluntary buyout on January 19, 2009.  (Doc. 39-6, ¶ 3(c)).

interpreted Mr. Stamps's comment about Mr. Tripp as a threat. (Doc. 39-1, p. 155).

Mr. Butler talked with Mr. Selby after receiving his 2012 evaluation and expressed his disagreement with Mr. Stamps's appraisal of his readiness for promotion. (Doc. 39-1, pp. 170-71; Doc. 39-10, ¶ 4). Mr. Selby then spoke with Mr. Stamps about Mr. Butler's 2012 evaluation. (Doc. 39-10, ¶ 4). According to Mr. Selby, Mr. Stamps explained that he appraised Mr. Butler as "needs development" because "Mr. Butler did not effectively communicate with the paint robot operators and others," and Mr. Stamps's explanation satisfied Mr. Selby. (Doc. 39-10, ¶ 4).

After receiving his 2012 evaluation, Mr. Butler also met with Mr. Roberts. (Doc. 39-1, ¶ 157; Doc. 39-9, ¶ 5). During the meeting, Mr. Butler told Mr. Roberts that he disagreed with Mr. Stamps's appraisal rating, and he did not like how Mr. Stamps spoke to him about the evaluation. (Doc. 39-9, ¶ 5). Based on what Mr. Butler told him, Mr. Roberts believed that Mr. Stamps acted appropriately with regards to Mr. Butler's 2012 evaluation. (Doc. 39-9, ¶ 5).

Although Mr. Stamps stated in his 2012 evaluation of Mr. Butler that he would develop a training plan for Mr. Butler and conduct another evaluation in January 2013, he did not do so. (Doc. 39-1, p. 152; Doc. 39-5, p. 46). Mr. Stamps

rotated to a new group leader position in February 2013, and Mr. McCurley became Mr. Butler's group leader again. (Doc. 39-8, ¶ 12).[8]

Mr. McCurley evaluated Mr. Butler in September 2013. (Doc. 32-2, pp. 20-21; *see also* Doc. 39-8, ¶ 12). Mr. McCurley gave Mr. Butler a rating of N in job progress and development and interpersonal skills and, therefore, gave Mr. Butler an overall rating of N. (Doc. 39-2, p. 20). In the 2013 evaluation, Mr. McCurley also gave Mr. Butler a potential appraisal of "needs development." (Doc. 39-2, p. 21). Mr. Selby, Mr. Smith, and Emerson Gore, an African-American team relations representative, reviewed and approved of Mr. Butler's 2013 evaluation. (Doc. 39-10, ¶ 5; Doc. 39-11, ¶ 6; Doc. 39-12, ¶¶ 1, 4).[9]

Mr. McCurley contends that Mr. Butler "regressed" from what he observed in 2009 and that "it was like [Mr. Butler] had shut down." (Doc. 39-4, p. 53; Doc.

---

[8] After Mr. Butler received his 2012 evaluation rating him as not ready for promotion, he stopped filling in as a group leader. (Doc. 39-1, p. 132). He started filling in as a group leader again when Mr. Hicks became his group leader in late 2013 or 2014. (Doc. 39-1, pp. 132-33, 198-99).

[9] Between January 2012 and June 2016, Mr. McCurley evaluated seven Caucasian and three African-American team leaders. (Doc. 39-7, ¶ 17). He appraised one of the three African-American team leaders as "ready for promotion," and he appraised three of the seven Caucasian team leaders as "ready for promotion." (Doc. 39-7, ¶ 17). Between January 2012 and June 2016, Mr. McCurley changed the potential appraisal of six team leaders, including Mr. Butler, from "ready for promotion" to "needs development." (Doc. 39-7, ¶ 18). Four of those team leaders were Caucasian, including one team leader, Thomas Treadway, who was interested in a promotion. (Doc. 39-7, ¶ 18, pp. 38-39, 77-78, 93-96, 99-102, 113-14).

39-7 ¶ 6).[10]  In particular, Mr. McCurley asserts that  "Mr. Butler was reluctant to step up to act as the group leader when [Mr. McCurley] was out, would displace other team members on the line so that [he] could work on the easiest position, and would fail to timely answer his radio, address part shortages, and resolve equipment issues."  (Doc. 39-7 ¶ 6; *see also* Doc. 39-4, pp. 52, 54-55).  Mr. McCurley also asserts that "Mr. Butler did not consistently communicate work issues effectively with team members," and he had "difficulty getting along with the paint robot operators."  (Doc. 39-7, ¶¶ 7-8).

After Mr. Butler received his 2013 evaluation, he had a meeting with Mr. McCurley, Mr. Selby, and Mr. Roberts, to discuss his evaluation.  (Doc. 39-1, pp. 191-92; Doc. 39-7, ¶¶ 10-11; Doc. 39-9, ¶ 6; Doc. 39-10, ¶ 5).  During the meeting, Mr. McCurley told Mr. Butler what he needed to do to become a group leader, and he specifically discussed Mr. Butler's communication skills and problem solving skills.  (Doc. 39-1, pp. 192-93; Doc. 39-10, ¶ 5).  Mr. Butler disagreed with Mr. McCurley's comments and with his evaluation.  (Doc. 39-1, p. 193; Doc. 39-7, ¶ 10; Doc. 39-9, ¶ 6).  At the meeting, Mr. Butler asked Mc. McCurley how he would feel if he had been in a position for a long time, had trained a person of a different race how to do the job, and the person he trained was promoted over him.  (Doc. 39-1, p. 194; Doc. 39-7, ¶ 11).  Mr. McCurley did not respond to Mr.

---

[10] Mr. McCurley testified that not being promoted "may have contributed" to the change in Mr. Butler's attitude between 2009 and 2013.  (Doc. 39-4, pp. 50-51).

Butler's question, and neither did anyone else at the meeting. (Doc. 39-1, p. 194).[11] According to Mr. Butler, after the meeting, Mr. Selby said that he felt that MBUSI had discriminated against him (Mr. Selby) with regards to promotion to a senior manager position. (Doc. 39-1, pp. 194-96).[12]

### C. Mr. Butler's EEOC Charge

Mr. Butler wrote to the Equal Employment Opportunity Commission on March 5, 2013 to inform the EEOC that he wanted to file a charge of

---

[11] According to Mr. McCurley, someone "explained to Mr. Butler that his race had nothing to do with his evaluation . . . ." (Doc. 39-7, ¶ 11). The Court must accept Mr. Butler's version of the facts at the summary judgment stage. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (quoting *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006)).

[12] The record also contains three evaluations dated after the filing of Mr. Butler's complaint. Toby Hicks became Mr. Butler's group leader in late 2013 or 2014. On September 12, 2014, he rated Mr. Butler's job performance as satisfactory in all areas, and he appraised Mr. Butler as "ready for promotion." (Doc. 39-2, pp. 23-24). Although Mr. Butler received a potential appraisal of "ready for promotion" in September 2014, the record does not indicate that he applied for a group leader position the following year.

Mr. McCurley became Mr. Butler's group leader again in 2015, and he evaluated Mr. Butler on September 1 of that year. (*See* Doc. 39-2, p. 25). In Mr. Butler's 2015 evaluation, Mr. McCurley gave Mr. Butler an N rating in three categories (job performance and development, interpersonal skills, and communication) and an overall rating of N. (Doc. 39-2, p. 25). Mr. McCurley also gave Mr. Butler a potential appraisal of "needs development." (Doc. 48-1, ¶ 14). Mr. Butler did not agree with the statements in his 2015 evaluation and refused to sign it. (Doc. 39-1, p. 200; Doc. 39-2, p. 25; Doc. 39-4, p. 63). In the 2015 evaluation, Mr. McCurley recommended that Mr. Butler take three classes to help with his career development. (Doc. 39-2, p. 25; Doc. 39-4, p. 63). Mr. Butler completed two of the three classes; MBUSI did not offer the third class. (Doc. 39-4, p. 56).

Mr. McCurley evaluated Mr. Butler again on September 12, 2016. (Doc. 39-7, pp. 18-19). In the 2016 evaluation, Mr. McCurley rated Mr. Butler as S is all areas and gave him an overall rating of S. (Doc. 39-7, p. 18). In addition, Mr. McCurley appraised Mr. Butler as "ready for promotion," noting that Mr. Butler "has demonstrated his will to succeed within the past year" and "has used the feedback given to him for self-improvement and has performed well as of late." (Doc. 39-7, p. 19).

discrimination against MBUSI. (Doc. 39-2, pp. 50-51). Mr. Butler filed his charge of discrimination with the EEOC on April 23, 2013, alleging that MBUSI discriminated against him because of his race and retaliated against him. (Doc. 39-2, p. 52). Mr. Butler asserted that Mr. Stamps gave him an unfair performance evaluation in 2012 because he (Mr. Butler) is African-American and in retaliation for the note that he (Mr. Butler) wrote to the robot operators. (Doc. 39-2, p. 52). In his EEOC charge, Mr. Butler also asserted that two similarly situated Caucasian employees, Nate Long and Jeremy Miller, were appraised as ready for promotion and promoted to the next level. (Doc. 39-2, p. 52). The EEOC investigated Mr. Butler's allegation and issued a right to sue letter to him on July 2, 2014. (Doc. 39-2, p. 65). This action followed.

D.     Evidence of Racially-Motivated Conduct at MBUSI

Mr. Butler testified that Mr. Stamps treated African-American and Caucasian employees differently, and Mr. Butler confronted Mr. Stamps about how Mr. Stamps favored Caucasian employees. (Doc. 48-1, ¶ 22). Specifically, Mr. Butler testified that Mr. Stamps showed favoritism towards Greg Adkins, a Caucasian paint robot operator and that Mr. Stamps distributed overtime unfairly. (Doc. 39-1, pp. 104-08, 125-29, 269).[13]

_____

[13] Mr. Butler testified that Mr. Stamps and Mr. Adkins are friends. (Doc. 39-1, pp. 190-91).

With regards to overtime, an African-American employee on Mr. Butler's team requested overtime during a Thanksgiving holiday, and Mr. Stamps told the employee that he could not work overtime because a Caucasian temporary employee was going to work overtime during the holiday. (Doc. 39-1, p. 125-26). Mr. Butler confronted Mr. Stamps about the situation, and Mr. Stamps then let the African-American team member work overtime. (Doc. 39-1, pp. 126-27). According to Mr. Butler, Mr. Stamps did not get upset when Mr. Butler discussed the overtime issue with him. (Doc. 39-1, p. 127). But, Mr. Butler attests that Mr. Stamps's attitude towards him changed after he confronted him about his treatment of African-American employees. (Doc. 48-1, ¶ 22).

In addition, in July 2013, MBUSI promoted a Caucasian team leader, Jeremy Miller, to a group leader position instead of an African-American team leader, Brian Avery. (Doc. 48-1, ¶ 39). According to Mr. Butler, Mr. Avery "had become so discouraged with not being promoted in 2012 and 2013, that on his 2015 evaluation [], he marked he was not interested in moving to the next level [], and on June 8 2015, [Mr. Avery] stepped down from his [team leader position] to a material handling position." (Doc. 48-1, ¶ 39).

Next, Mr. Smith sent an email to group leaders in the paint shop in September 2014 about the condition of a certain area in the shop. (Doc. 39-11, ¶ 8, p. 7). In the email, Mr. Smith complained about paint sprayed on the walls of the

area, and he stated that the condition of the area is "very poor" even though it recently had been cleaned and painted. (Doc. 39-11, p. 7). Mr. Smith concluded his email by stating:

> We are trying to send a message to the team members that we want them to build quality into the $50,000 to $120,000 vehicles they are prepping. It is hard to convey that message when the area just before the luxury vehicles are to be painted in looks like a ghetto!

(Doc. 39-11, p. 7). Mr. Smith did not direct the email to Mr. Butler, but Mr. Butler saw a copy of the email on Mr. McCurley's desk. (Doc. 39-1, pp. 252-53; Doc. 39-11, p. 7). Mr. Smith's statement that the shop areas looked like a ghetto offended Mr. Butler because "most ghettos [are] in slum areas in black communities." (Doc. 39-1, p. 254).

Finally, Mr. McCurley used an offensive racial epithet when talking with an MBUSI employee in 2016. (Doc. 39-4, pp. 77-78, 81).[14] During a conversation about motorcycles, Mr. McCurley told the employee that the gear shift on his motorcycle broke during a trip. (Doc. 39-4, p. 77). Mr. McCurley told the employee that he decided to continue the trip because he could "nigger-rig" the gear shift back together. (Doc. 39-4, p. 77). Mr. McCurley testified that he later apologized to the employee for his use of the offensive term, and Mr. McCurley reported the incident to MBUSI's human resources department. (Doc. 39-4, pp.

---

[14] Mr. McCurley initially testified that he had never used the racial epithet while working at MBUSI. (Doc. 39-4, p. 24).

78-79).  After Mr. McCurley reported the incident, MBUSI sent him home for the day while the human resources department talked with the employee.  (Doc. 39-4, pp. 79-80).

E.    Promotions to Group Leader Positions at MBUSI

There are fifteen group leader positions in the paint shop.  (Doc. 39-5, p. 21). As discussed, MBUSI did not promote any team leaders to a group leader position in 2010, 2011, and 2012.  (*See also* Doc. 39-11, ¶ 12).  Between January 1, 2013 and June 2016, MBUSI promoted nine team leaders to a group leader position in the paint shop.  (Doc. 39-11, ¶ 12).  Three of the nine leaders promoted to a group leader position in the paint shop are African-American.  (Doc. 39-11, ¶ 12).

Between January 1, 2013 and September 2014, MBUSI promoted 44 team leaders to a group leader position at the production facility in Vance.  (Doc. 48-2). Only seven of the 44 team leaders promoted are African-American.  (Doc. 48-2).

## III.    ANALYSIS

### A.    **Motion to Strike**

MBUSI asks the Court to strike portions of Mr. Butler's declaration because, MBUSI argues, the statements contradict Mr. Butler's prior sworn deposition testimony and because the statements are speculative and contain conclusory allegations and irrelevant material.  (Doc. 52, pp. 1-2). [15]  Under Rule 56(c)(2) of

---

[15] Effective December 1, 2010, motions to strike summary judgment evidence no longer are appropriate.  *See* Fed. R. Civ. P. 56(c)(2) advisory committee's note (2010 amendments)

the Federal Rules of Civil Procedure, at the summary judgment stage, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). These objections function like trial objections adjusted for the pretrial setting, and "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." Fed. R. Civ. P. 56(c)(2) advisory committee's note (2010 amendments).

Rule 56(c)(2) enables a party to submit evidence that ultimately will be admissible at trial in an inadmissible form at the summary judgment stage. Under the rule, a district court may, for example, "'consider a hearsay statement in passing on a motion of summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form.'" *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999)). A district court has broad discretion at the summary judgment stage to determine what evidence it will consider pursuant to Rule 56(c)(2). *See Green v. City of Northport*, 2014 WL 1338106, at *1 (N.D. Ala. March 31, 2014).

---

("There is no need to make a separate motion to strike."); *Campbell v. Shinseki*, 546 Fed. Appx. 874, 879 (11th Cir. 2013) ("The plain meaning of [amended Rule 56(c)(2)] show[s] that objecting to the admissibility of evidence supporting a summary judgment motion is now a part of summary judgment procedure, rather than a separate motion to be handled preliminarily . . . ."). Accordingly, the Court construes MBUSI's motion to strike as an objection to Mr. Butler's evidence.

MBUSI objects to statements Mr. Butler made about filling in as a group leader for Mr. McCurley because the statements contradict Mr. Butler's prior testimony about when he filled in as a group leader. (Doc. 52, pp. 2-3). At his deposition, Mr. Butler testified that he stopped filling in for the group leader position "[f]or about a year" after he received his September 2012 evaluation from Mr. Stamps rating him as not ready for promotion to the group leader position. (Doc. 39-1, p. 132). He added that he began filling in as a group leader again when "[Mr.] Hicks came back as group leader." (Doc. 39-1 at 132-33). Mr. Hicks became Mr. Butler's group leader sometime after September 3, 2013, when Mr. McCurley evaluated Mr. Butler. (*See* Doc. 39-2, pp. 20-21, 23-24). Thus, based on Mr. Butler's deposition testimony, he did not fill in as a group leader between September 2012 and September 2013.

In paragraph 4 of Mr. Butler's declaration, he states that "Mr. McCurley gave me these scores [in my September 3, 2013] evaluation despite the fact that I was filling in for him as a [group leader] when [Mr.] McCurley was absent from work because [Mr.] McCurley believed I did a good job when filling in for him." (Doc. 48-1, ¶ 4). Without explicitly saying so, this statement implies that Mr. Butler filled in for Mr. McCurley in 2013, which is contrary to Mr. Butler's prior deposition testimony. Mr. Butler does not give an explanation for the contradictory testimony, (*see* Doc. 48-1; Doc. 55), and he cannot create a question

of fact by submitting a declaration that merely contradicts his prior testimony. *Van T. Junkins and Assoc., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984). Thus, to the extent that Mr. Butler's statement in paragraph 4 of his declaration implies that he filled in as a group leader for Mr. McCurley in 2013, the Court will not consider it.

MBUSI also objects to statements in paragraphs 3, 27, 34, and 43 of Mr. Butler's affidavit on similar grounds. (Doc. 52, pp. 2-3). In those paragraphs, Mr. Butler states that Mr. Stamps and Mr. McCurley asked him to fill on for them as group leader when they were absent and that he regularly filled in for various group leaders during their absences. (Doc. 48-1, ¶¶ 3, 27, 34, 43). Those general statements do not necessarily contradict Mr. Butler's deposition testimony. Accordingly, the Court overrules MBUSI's objections to statements in those paragraphs.

MBUSI also objects to other statements in Mr. Butler's declaration, arguing that the statements are conclusory and lack foundation. (Doc. 52, pp. 3-6). Specifically, MBUSI objects to Mr. Butler's statements that (1) he had "seniority and experience over the individuals promoted" to group leader positions, (2) he "confronted Mr. Stamps about how he []favored white employees [over] black employees;" and (3) his 2012 appraisal disqualified him from promotions. (Doc. 52, pp. 3-6 (citing Doc. 48-1, ¶¶ 15-16, 22-23, 28-29, 35, 37, 41)). Even if the

statements are conclusory and lack foundation, Mr. Butler could present them in admissible form at a trial of this matter by testifying more specifically about his qualifications, his confrontations with Mr. Stamps, and his 2012 appraisal. Additionally, Mr. Butler could present evidence to establish the basis of his knowledge. Moreover, the issue is moot because the Court finds that Mr. Butler failed to create a genuine issue of material fact regarding his discrimination claim even if the Court considers the evidence that MBUSI challenges.

### B.   Retaliation Claim

The parties dispute whether Mr. Butler asserts a retaliation claim against MBUSI in his amended complaint. (*See* Docs. 49, 51, 58, and 59). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). "The purpose of [Rule 8(a)] 'is to give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Palmer v. Albertson's LLC*, 418 Fed. Appx. 885, 889 (11th Cir. 2011) (quoting *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 974 (11th Cir. 2008)). In addition to Rule 8, Rule 10 governs a plaintiff's complaint and provides that "[a] party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances." Fed. R. Civ. P. 10(a). The Eleventh Circuit has "explained that Rules 8 and 10 [] 'work together to require the pleader to present his claims discretely and succinctly, so that his adversary can

discern what he is claiming and frame a responsive pleading . . . .'" *Palmer*, 418 Fed. Appx. at 889 (quoting *Davis*, 516 F.3d at 974).

In his effort to identify a retaliation claim, Mr. Butler first argues that his EEOC charge put MBUSI on notice of the claim. (Doc. 49, p. 23; *see also* Doc. 58, pp. 8-10).[16] Mr. Butler's argument is unavailing because his amended complaint—not his EEOC charge—identifies the claims that he asserts in this action. *See Marshall v. Mayor and Alderman of City of Savannah, Ga.*, 366 Fed. Appx. 91, 101 (11th Cir. 2010) (finding that a plaintiff's EEOC charge, which was not attached to her complaint, was not relevant to the question whether the plaintiff asserted a retaliation claim against her former employer and looking only to the plaintiff's complaint to determine if she asserted a retaliation claim). Indeed, Mr. Butler concedes that "the [c]omplaint controls the lawsuit." (Doc. 58, p. 10).

Mr. Butler also argues that his attorney's lines of inquiry during Mr. McCurley's and Mr. Stamps's depositions and the testimony of those witnesses gave MBUSI notice of his retaliation claim. (Doc. 49, pp. 23-24). Mr. Butler's argument misses the mark because "the discussion of a potential claim in a deposition does not satisfy the requirement of Rule 8(a)." *Brown v. Snow*, 440 F.3d 1259, 1266 (11th Cir. 2006) (citing *Coon v. Georgia Pac. Co.*, 829 F.2d 1563, 1568 (11th Cir. 1987)). Mr. Butler cannot rely upon discovery in this action or his

---

[16] Mr. Butler did not attach his EEOC charge to his complaint or amended complaint. (*See* Docs 1 & 15).

EEOC charge to satisfy the requirements of Rules 8 and 10. Instead, Mr. Butler's amended complaint must give MBUSI fair notice of his alleged retaliation claim.

Mr. Butler points to four paragraphs in his amended complaint to support his argument that he "clearly" alleges that MBUSI retaliated against him. (Doc. 49, p. 4, n.1 and p. 23) (citing Doc. 15, ¶¶ 4, 16, 20, and VII(b)).[17] As an initial matter, the allegations in paragraphs four and twenty do not mention or allude to retaliation or protected activity. Instead, in those two paragraphs, Mr. Butler alleges that he filed this action within 90 days of receiving his right to sue letter from the EEOC, that no administrative exhaustion requirement applies to his § 1981 claims, and that he received a "not ready" rating from Mr. McCurley in his 2013 evaluation. (Doc. 15, ¶¶ 4, 20). Therefore, the allegations in paragraphs four and twenty do not give MBUSI notice of a retaliation claim.

In paragraph sixteen of his amended complaint, Mr. Butler alleges as follows:

> [Mr.] Butler was issued a *discriminatory* performance evaluation on September 28, 2012[] by [Mr.] Stamps, which caused his promotion status to be changed from "ready" to "not ready." [Mr. Butler] believes he was issued this unfair performance evaluation based on his race and in retaliation because he wrote a note to the robot operators asking that they stop taking shortcuts when they work on weekends. The shortcuts were causing a lot of downtime when [Mr. Butler] returned to his shift on Mondays. The robot operators are Caucasian

---

[17] Mr. Butler's amended complaint does not contain separate counts. (*See* Doc. 15). Rather, the amended complaint contains a section titled "causes of action," which contains seventeen separately numbered paragraphs. (Doc. 15, ¶¶ 7-23).

and [Mr.] Stamps told [Mr. Butler] he should not have written the note, even if it was true.

(Doc. 15, ¶ 16) (emphasis added). Although Mr. Butler alleges that he believes that Mr. Stamps gave him an unfavorable evaluation in 2012 "in retaliation," he describes his September 2012 evaluation as "discriminatory." In addition, Mr. Butler explains that he believes the evaluation was retaliation for a note that he left for the robot operators in August 2012 complaining about shortcuts that the operators took over the weekend. (Doc. 15, ¶ 16). The note did not challenge an unlawful employment action. (*See* Doc. 39-1, pp. 164-66; Doc. 39-2, p. 19). Therefore, Mr. Butler's August 2012 note is not protected activity. *See* 42 U.S.C. § 2000e-3(a); *compare Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 507 (11th Cir. 2000) (finding that statutorily protected activity includes internal complaints about an unlawful employment practice). In paragraph sixteen, Mr. Butler alleges that Mr. Stamps gave him a discriminatory evaluation because of his race and because Mr. Butler wrote the note to the Caucasian robot operators. Those allegations do not give MBUSI fair notice of a retaliation claim.

In paragraph VII(b) of his amended complaint, Mr. Butler requests "[a] temporary and permanent injunction against MBUSI . . . from engaging in any further unlawful practices, policies, customs, usages, racial discrimination and retaliation by such defendant set forth herein . . . ." (Doc. 15, ¶ VII(b)). Standing

alone, Mr. Butler's request for relief is not sufficient to give MBUSI fair notice of a retaliation claim. This is especially true in light of Mr. Butler's statement earlier in his amended complaint that he "seeks a permanent injunction and other equitable relief necessary to eliminate the effects of MBUSI's past and present racial discrimination and prevent such discrimination from continuing to adversely affect his life and career . . . ." (Doc. 15, ¶ 2). In addition, the allegations in Mr. Butler's amended complaint do not set forth any of the elements of a retaliation claim. (*See* Doc. 15); *see also Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1310 (11th Cir. 2016) (identifying the elements of a retaliation claim). Therefore, Mr. Butler's allegations in his amended complaint do not give MBUSI fair notice of a retaliation claim or satisfy the requirements of Rule 8(a) with regards to Mr. Butler's alleged retaliation claim.

Allowing Mr. Butler to plead a retaliation claim at this stage in the case would prejudice MBUSI. Under Rule 26(f), "the parties must confer," and "[i]n conferring, the parties must consider the nature and the basis of their claims and defenses . . . ." Fed. R. Civ. P. 26(f)(1)-(2). As required, the parties conferred and submitted a report of their meeting to the Court, which was signed by an attorney for both parties. (Doc. 18). The report includes a general case synopsis stating:

> In his complaint, [Mr. Butler] asserts that he was not promoted because of race in violation of Title VII . . . and in violation of § 1981. MBUSI denies that it has discriminated against [Mr. Butler] because of his race and asserts various affirmative defenses.

(Doc. 18, ¶ 2).

In addition, a brief discussion between the parties' attorneys at the conclusion of Mr. Butler's deposition shows that at the time of Mr. Butler's deposition, the parties understood that Mr. Butler asserted only a discrimination claim against MBUSI in this action, not a retaliation claim:

> Mr. Lucas: [] I know in [Mr. Butler's] EEOC charge, you put retaliation in, but he didn't in his complaint. So, I'm assuming we don't have a retaliation case here; is that correct?
>
> Mr. Wiggins: At this point in time.

(Doc. 39-1, pp. 293-94).

Mr. Butler did not ask to amend his complaint to assert a retaliation claim against MBUSI. Under these circumstances, Mr. Butler cannot raise a new claim at the summary judgment stage or a potential trial of this matter. *See Iraola & CIA, S.A. v. Kimberly-Clark Corp.*, 325 F.3d 1274, 1286 (11th Cir. 2003) ("[T]he District Court properly decided not to allow [the plaintiff] to raise a new claim at the summary judgment stage."). Thus, the Court will not consider Mr. Butler's alleged retaliation claim.[18]

---

[18] In his sur-reply brief, Mr. Butler argues that MBUSI should have filed a motion for a more definite statement under Rule 12(e) if it was unsure if Mr. Butler asserted a retaliation claim. (Doc. 58, pp. 10-12). Mr. Butler's argument fails because a plaintiff must satisfy Rule 8(a)'s pleading requirements; he cannot transfer that burden to the defendant. *See Marshall*, 366 Fed. Appx. at 101 (rejecting a plaintiff's argument that her employer should have filed a motion for a more definite statement if the employer was unsure of the claims she asserted against it) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

## C.     Race Discrimination Claims

Mr. Butler asserts that because he is African-American, MBUSI discriminated against him by giving him unfavorable evaluations in 2012 and 2013 and by failing to promote him to a group leader position. (Doc. 15, ¶¶ 16-23). The Court analyzes Mr. Butler's Title VII and § 1981 race discrimination claims under the same framework. *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) ("Both [Title VII and § 1981] have the same requirements of proof and use the same analytical framework . . . ."). A plaintiff may establish a discrimination claim "through direct evidence, circumstantial evidence, or through statistical proof." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008). "Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *Standard*, 161 F.3d at 1330 (citation omitted). "'[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate on the [basis of a protected classification]' are direct evidence of discrimination." *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1227 (11th Cir. 2002) (citation omitted). Mr. Butler has not presented direct evidence of discrimination in this case. (*See* Docs. 48 & 49).

When a plaintiff relies on circumstantial evidence to establish his discrimination claim, the Court evaluates the claim under the burden-shifting

framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). Under *McDonnell Douglas*, a plaintiff first must establish a prima facie case by presenting evidence that (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was treated less favorably than a similarly-situated individual outside of his protected class. *Maynard v. Bd. of Regents of Div. of Fla. Dept. of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003) (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1817). "The methods of presenting a prima facie case are flexible and depend on the particular situation." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010); *see also Rioux*, 520 F.3d at 1275 ("More than one formulation of the elements of a prima facie case exist.").

If the plaintiff establishes a prima facie case, then the burden shifts to the employer to produce evidence of a legitimate, non-discriminatory reason for the challenged action. *Rioux*, 520 F.3d at 1275. If the employer satisfies its burden, then the burden shifts back to the plaintiff to prove the employer's "proffered reason really is a pretext for unlawful discrimination." *Id.* (internal quotation marks and citations omitted).

For purposes of deciding MBUSI's summary judgement motion, the Court assumes that Mr. Butler can establish a prima facie case of discrimination based on

his unfavorable 2012 and 2013 evaluations and MBUSI's failure to promote him to a group leader position. Therefore, MBUSI must articulate a legitimate reason for its actions. *Rioux*, 520 F.3d at 1275. MBUSI's burden to produce evidence of legitimate nondiscriminatory reasons for its actions is "exceedingly light." *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997).

MBUSI contends that it had legitimate reasons for its actions because (1) it did not promote any team leaders to group leader positions in 2010 or 2011, (2) Mr. Butler did not apply for a group leader position after 2010, and (3) the company had a good faith belief that Mr. Butler was not ready for promotion based on his alleged failure "to display the problem solving skills and communication skills needed to be an effective group leader." (Doc. 41, p. 27). That is enough to satisfy MBUSI's burden. *See Cooper v. Southern Co.*, 290 F.3d 695, 730 (11th Cir. 2004) (recognizing an employee's lack of "superior communication skills" and "teamwork skills" as legitimate reasons for an employer not to promote the employee) (*overruled in part on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006)). Therefore, to survive MBUSI's summary judgment motion, Mr. Butler "must introduce significantly probative evidence showing that [MBUSI's] asserted reason is merely pretext for discrimination." *Brooks v. Cnty. Comm'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006) (quotation omitted).

Mr. Butler can show that MBUSI's proffered reason is pretext "directly, by persuading the court that a discriminatory reason more likely than not motivated the employer, or indirectly, by showing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence.'" *Paschal v. United Parcel Serv.*, 573 Fed. Appx. 823, 825 (11th Cir. 2014) (quoting *Alvarez*, 610 F.3d at 1265). Mr. Butler's burden "is to show not just that [MBUSI's] proffered reasons for firing [him] were ill-founded but that unlawful discrimination was the true reason." *Alvarez*, 610 F.3d at 1267. The Court does not "sit as a 'super-personnel department,' and it is not [the Court's] role to second-guess the wisdom of [MBUSI's] business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive." *Id.* at 1266 (quoting *Chapman v. A1 Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc)).

Though it is one tool for examining evidence of discriminatory intent, "'the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion' in Title VII cases." *Flowers v. Troup County, Ga., School Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015) (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). "The critical decision that must be made is whether the plaintiff has 'create[d] a

triable issue concerning the employer's discriminatory intent.'" *Flowers*, 803 F.3d at 1336 (quoting *Lockheed-Martin Corp.*, 644 F.3d at 1328). A convincing mosaic of circumstantial evidence may be sufficient to allow a jury to infer that discriminatory intent motivated an employment decision. *Lockheed-Martin Corp.*, 644 F.3d at 1328. "Whatever form it takes, if the circumstantial evidence is sufficient to raise 'a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper.'" *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1256 (11th Cir. 2012) (quoting *Lockheed-Martin Corp.*, 644 F.3d at 1328).[19]

Mr. Butler attacks MBUSI's proffered reasons for failing to promote him on several grounds: (1) the objective and subjective portions of Mr. Butler's 2012 performance evaluation contradict each other; (2) Mr. Stamps's and Mr. McCurley's explanations for giving Mr. Butler a potential appraisal of "needs development" are not credible; (3) Mr. Butler received performance appraisals of "ready" when there were no open group leader positions, and he received performance appraisals of "needs development" when group leader positions were available; and (4) Mr. Butler had more seniority than the team leaders promoted to

---

[19] "A 'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis v. City of Union City*, 877 F.3d 1000, 1018 (11th Cir. 2017) (internal quotation marks and citation omitted).

group leader positions. In addition, Mr. Butler presented circumstantial evidence of racially-motivated conduct and statistical evidence to support his race discrimination claims. The Court considers Mr. Butler's arguments and evidence in turn.

1.    <u>The objective and subjective portions of Mr. Butler's 2012 evaluation</u>

Mr. Butler asserts that the objective portion of his 2012 evaluation, in which Mr. Stamps rated his performance as a team leader as "satisfactory," and the subjective portion of his 2012 evaluation, in which Mr. Stamps appraised Mr. Butler's potential as "needs development" or "not ready for a promotion," are contradictory. (Doc. 48-1, ¶ 31; Doc. 49, pp. 17, 27-29; Doc. 58, pp. 14-15). Mr. Butler contends that Mr. Stamps's subjective appraisal that Mr. Butler was not ready for promotion to a group leader position is nothing more than Mr. Stamps's personal opinion and that the subjective appraisal provides a ready mechanism for discrimination. (Doc. 49, pp. 6, 27-29; Doc. 48-1, ¶ 5).

As an initial matter, even if Mr. Stamps's appraisal rating of Mr. Butler as "needs development" is just his subjective opinion, employers may use subjective criteria when making hiring or promotion decisions. *Springer v. Convergys Customer Mgmt. Group, Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007) ("'Absent evidence that subjective hiring criteria were used as a mask for discrimination, the fact that an employer based a hiring or promotion decision on purely subjective

criteria will rarely, if ever, prove pretext . . . .'") (quotation omitted); *Chapman*, 229 F.3d at 1033; *Fowler v. Blue Bell, Inc.*, 737 F.2d 1007, 1011 (11th Cir. 1984) (quoting *Robbins v. White-Wilson Medical Clinic, Inc.*, 660 F.2d 1064, 1067 (5th Cir. Unit B 1981)). The Eleventh Circuit has recognized that qualities like problem solving or communication skills "often must be assessed primarily in a subjective fashion, [] yet they are essential to an individual's success in a supervisory or professional position." *Chapman*, 229 F.3d at 1034 (citations omitted). Thus, "[a] subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the [employer] articulates a clear and reasonably specific factual basis upon which it based its subjective opinion." *Id.*

Mr. Stamps testified that he gave Mr. Butler a potential appraisal of "needs development" because of the tone of the note Mr. Butler wrote to the robot operators and because of Mr. Butler's interpersonal skills. In addition, Mr. Stamps attested that "Mr. Butler would sometimes cast blame . . . when addressing work issues," and Mr. Butler "needed to work with team members to solve problems . . . to create 'win-win' situations." (Doc. 39-8, ¶ 6). Mr. Stamps's testimony provides a clear and reasonably specific factual basis for his subjective opinion of Mr. Butler's potential for promotion.

Mr. Butler argues that Mr. Stamps's appraisal of his potential is discriminatory because it contradicts Mr. Stamps's evaluation of his job

performance, (Doc. 49, pp. 17; Doc. 48-1, ¶ 31); however, the ten performance criteria on the first page of the evaluation form measure different qualities than the potential appraisal on the second page of the evaluation. The ten performance criteria measure Mr. Butler's performance as a team leader, and the potential appraisal measures his readiness for a group leader position, a position which may require skills different than the skills related to a team leader position. (*See* Doc. 39-2, pp. 17-18). Therefore, it is not inherently contradictory for a team leader to receive a performance rating of S and a potential appraisal of "needs development."[20]

In addition, the record shows that in 2012 and 2013, Mr. Stamps gave two Caucasian employees who desired a promotion an overall rating of S and a potential appraisal of "needs development." (Doc. 39-5, pp. 94-99).[21] Thus, Mr. Stamps's 2012 evaluation of Mr. Butler does not constitute evidence of pretext.

2. <u>Credibility of MBUSI's reasons for appraising Mr. Butler as not ready for promotion</u>

Mr. Butler contends that Mr. Stamps's and Mr. McCurley's reasons for giving him a potential appraisal of "needs development" are not credible. (Doc.

---

[20] In Mr. Butler's 2006 – 2008 evaluations, Brad Bricken and Ricky Seale gave Mr. Butler an overall performance rating of S and a potential appraisal of "needs development." (Doc. 39-2, pp. 7-12).

[21] Mr. Stamps also gave four Caucasian employees who were not interested in promotion an overall rating of S and a potential appraisal of "needs development." (Doc. 39-5, pp. 100-05, 118-19).

49, pp. 18, 22; Doc. 48-1, ¶ 21). As mentioned above, Mr. Stamps testified that he gave Mr. Butler a potential appraisal of "needs development" in part because he was concerned about the tone of the note that Mr. Butler wrote and left for robot operators and because of concerns about Mr. Butler's problem solving and interpersonal skills. (Doc. 39-5, pp. 50-53).[22] Mr. McCurley testified that he appraised Mr. Butler as "not ready for a promotion" because Mr. Butler did not display initiative on the job and did not communicate effectively with all of his team members. (Doc. 39-4, pp. 53-55; Doc. 39-7, ¶¶ 7-8).

Mr. Butler did not offer evidence to directly contradict the reasons given by Mr. Stamps and Mr. McCurley for their appraisals of his potential, other than Mr. Butler's own opinion that he disagreed with their appraisals and was qualified for a group leader position. (*See* Docs. 49 & 58; Doc. 39-1, p. 193; Doc. 48-1, ¶ 27). "[T]he inquiry into pretext centers on the employer's beliefs, not the employee's beliefs, and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Alvarez*, 610 F.3d at 1266 (citing *Holifield*, 115 F.3d at 1565). Thus, Mr. Butler's belief that he was ready for promotion is not sufficient to create a question of fact regarding pretext.

---

[22] Mr. Butler questions how Mr. Stamps could determine the tone of a handwritten note. (*See* Doc. 49, pp. 18-19, n.12 & n.14). Tone simply means the "style or manner of approach in speaking or writing." Tone, WEBSTER'S NEW INTERNATIONAL DICTIONARY 2407 (3rd ed. 1993). There is nothing remarkable about making a conclusion regarding the tone of a handwritten note.

Mr. Butler contends that Mr. Stamps's and Mr. McCurley's reasons for appraising him as "not ready for a promotion" to a group leader position in September 2012 and 2013 are not credible because Mr. Butler filled in for them as a group leader. (Doc. 49, pp. 10, 16, 30, 33; Doc. 58, pp. 14-15, 18). According to Mr. Butler, Mr. Stamps and Mr. McCurley must have believed that he was qualified to be a group leader because they asked him to serve as a group leader when they were absent. (Doc. 48-1, ¶¶ 27, 34). Mr. Stamps testified that he approached Mr. Butler about filling in as group leader for him because Mr. Butler could do the job, and Mr. Curley admitted that Mr. Butler did a good job when he filled in for him. (Doc. 39-5, pp. 39-40; Doc. 39-4, p. 58).

Filling in for a group leader in his or her absence is not the same as holding the position full time, and nothing in the record suggests that a team leader who filled in for an absent group leader would perform all of the duties of the group leader. Indeed, there is nothing to indicate that a team leader who fills in for a group leader when he or she is absent would be responsible for disciplining employees or conducting the annual evaluations of MBUSI employees. Thus, filling in for a group leader does not show that Mr. Butler was ready to hold the position full time. *See Breeding v. Arthur J. Gallagher and Co.*, 164 F.3d 1151, 1158 (8th Cir. 1999) ("Although [the plaintiff] was required to fill in and do some of the duties of this position when [another employee] was absent, [the plaintiff]

has not demonstrated on this record that she was qualified for the position.")
(*abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031
(8th Cir. 2011)). Mr. Stamps's and Mr. McCurley's belief that Mr. Butler did a
good job filling in for them as group leader in their absence does not establish that
they believed he was ready to be promoted to the position full time or that their
stated reasons for appraising him as "needs development" mask discriminatory
motives. On the record in this case, the evaluations of Mr. Butler's short-term
substitutions and his potential for holding a group leader position full time are not
mutually exclusive.

Mr. Butler also argues that Mr. Stamps's and Mr. McCurley's reasons for
appraising him as "needs development" are not credible because neither evaluator
issued a corrective action form or written discipline to him between 2012 and
2014. (Doc. 49, pp. 10, 17; Doc. 48-1, ¶ 21). In addition, according to Mr. Butler,
Mr. McCurley and Mr. Stamps never counseled him about his work performance,
though he admits that Mr. Stamps talked with him about the August 2012 note he
left for the robot operators. (Doc. 48-1, ¶ 31, 34). Mr. Butler did not cite any
evidence regarding MBUSI's disciplinary policies to support his argument, (*see*
Docs. 49 & 58), and there is nothing in the record to suggest that an MBUSI
employee should be disciplined or counseled outside of the annual evaluation for
issues regarding the employee's initiative, communication skills, or problem

solving skills. Thus, the lack of disciplinary action against Mr. Butler does not suggest that Mr. Stamps's and Mr. McCurley's stated reasons for their appraisal of Mr. Butler are pretext.

3.   Timing of Mr. Butler's evaluations appraising him as not ready for promotion

Mr. Butler argues that he received a potential appraisal of "ready" only when there were no open group leader positions, and he received a potential appraisal of "needs development" when group leader positions were available, and he contends that "[Mr.] Stamps and [Mr.] McCurley knew when promotions were going to happen . . . ." (Doc. 58, p. 7). Mr. Butler presented no evidence to suggest that either Mr. Stamps or Mr. McCurley knew in advance when a group leader position would become available, and it would be speculation to find that either rated Mr. Butler as "ready for promotion" only when no promotions to group leader positions would occur in the following year. Correlation is not the same as causation. Thus, Mr. Butler's timing argument lacks evidentiary support.[23]

4.   Mr. Butler's seniority and experience

Mr. Butler asserts that he had more seniority and experience than the team leaders MBUSI promoted to group leader positions. (Doc. 49, p. 12; Doc. 48-1,

---

[23] The Court notes that Mr. Butler received an appraisal of "ready for promotion" in September 2014, but there is no evidence that Mr. Butler applied for a group leader position between September 2014 and September 2015, when he again received an appraisal of "needs development." (*See* Doc. 39-2, pp. 23-25).

¶¶ 16, 28, 35, 37).  The record does not indicate that MBUSI bases its promotions to group leader position on seniority or that seniority is a consideration in MBUSI's promotion process.  In addition, there is no evidence in the record that suggests that MBUSI ever deviated from its established promotion process when selecting group leaders.  Instead, Mr. Smith attested that all of the team leaders promoted to group leader positions had been appraised as "ready for promotion" by their group leaders, had applied for a position, and "had successfully completed an assessment test, the interview process, and the peer input process."  (Doc. 39-11, ¶ 13).

Moreover, "[i]n the context of a promotion, 'a plaintiff cannot prove pretext by simply arguing or even showing that he was better qualified than the person who received the position he coveted.  . . .  [A] plaintiff must show that the disparities between the successful applicant's and his own qualifications were 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff.'"  *Springer*, 509 F.3d at 1349 (quotations omitted).  Here, Mr. Butler did not introduce evidence regarding the qualifications of the team leaders MBUSI selected for group leader positions, and Mr. Butler's assertion that he had more seniority and

experience than the team leaders selected does not create a question of fact regarding pretext.[24]

5. Circumstantial evidence of discriminatory intent

Mr. Butler presents other circumstantial evidence of alleged discrimination and racially motivated conduct at MBUSI to support his discrimination claim. First, Mr. Butler testified that Mr. Stamps treated Caucasian team members more favorably than African-American team members. (Doc. 39-1, pp. 104-08, 125-29, 269; Doc. 48-1, ¶ 22). Specifically, Mr. Butler complained that Mr. Stamps showed favoritism toward a Caucasian paint robot operator and that Mr. Stamps distributed overtime unfairly. (Doc. 39-1, pp. 104-08, 125-29, 269). Mr. Butler testified that the robot operator was Mr. Stamps's friend and the operator socialized outside of work with Mr. Stamps. (Doc. 39-1, pp. 190-91). In addition, Mr. Butler testified that Mr. Stamps did not get upset when he confronted Mr. Stamps about the distribution of overtime and that Mr. Stamps addressed the issue and allowed an African-American team member to work overtime during a holiday. (Doc. 39-1, pp. 125-27). Based on Mr. Butler's testimony, Mr. Stamps's

---

[24] In his sur-reply brief, Mr. Butler argues that MBUSI did not introduce evidence to show qualifications of the team leaders selected for group leader positions and what made them more qualified than Mr. Butler. (Doc. 58, p. 3). However, Mr. Butler bears the burden of proving pretext. *See Alvarez*, 610 F.3d at 1265-66. Mr. Butler did not submit an affidavit or declaration under Rule 56(d) stating that he could not present facts essential to his opposition of MBUSI's motion, and he did not request time to obtain additional discovery.

allegedly favorable treatment of Caucasian employees does not raise a question of fact regarding racial animus or pretext.

Second, Mr. Butler presented evidence that MBUSI promoted Mr. Miller, a Caucasian team leader, to a group leader position in July 2013 instead of Brian Avery, an African-American team leader with more seniority. (Doc. 48-1, ¶ 39). According to Mr. Butler, Mr. Avery became so discouraged about not being promoted to a group leader position that Mr. Avery transferred from his team leader position to a material handling position on June 8, 2015. (Doc. 48-1, ¶ 39; Doc. 48-6). Without more, however, MBUSI's promotion of Mr. Miller over Mr. Avery does not raise a question of material fact regarding pretext. *See* pp. 41-43, *supra*.

Mr. Butler also testified that Mr. Selby told him that Mr. Selby felt discriminated against with regards to promotion to a senior manager position at MBUSI. (Doc. 39-1, pp. 194-96).[25] However, Mr. Butler did not introduce evidence regarding a position Mr. Selby applied for and did not receive, and he did not identify who MBUSI may have promoted instead of Mr. Selby. Thus, Mr. Butler's testimony regarding Mr. Selby's allegation of discrimination does not create a question of fact regarding pretext.

---

[25] The Court may consider this hearsay statement at the summary judgment stage because Mr. Butler could reduce it to admissible evidence at a trial of this matter if he called Mr. Selby as a witness. *See Jones*, 683 F.3d at 1293-94.

Next, in a September 2014 email to group leaders, Mr. Smith said that an area of the paint shop with paint sprayed on its walls looked like a ghetto. (Doc. 39-11, p. 7). Mr. Smith's choice of words was unprofessional and ill-considered, but there is no evidence that Mr. Smith's comment was directed to Mr. Butler or any particular MBUSI employees. Mr. Butler testified that he could not recall any time a manager at MBUSI, including Mr. Smith, made a racially derogatory comment to him or in his presence. (Doc. 39-1, p. 277). Additionally, there is nothing to suggest that Mr. Smith made similar comments in relation to any decision regarding promotions or employee evaluations. Thus, Mr. Smith's September 2014 email, standing alone, is not sufficient to create a question of fact regarding racial pretext.

Finally, Mr. McCurley used an offensive racial slur when talking with an African-American team member in 2016. Specifically, Mr. McCurley told the team member that he could "nigger-rig" a broken gear shift on his motorcycle. (Doc. 39-4, pp. 77-78). Mr. McCurley's use of the racial epithet is inexcusable. Even so, and without discounting the offensiveness of the epithet or the seriousness of Mr. McCurley's action, there is no evidence in the record to suggest that Mr. McCurley used the offensive term on another occasion or in relation to an employee at MBUSI, an employee's evaluation, or a promotion decision. In addition, there is nothing to suggest that Mr. McCurley ever used the offensive

epithet or other offensive language in Mr. Butler's presence or with regards to Mr. Butler. Thus, the evidence regarding Mr. McCurley's use of the racial slur, by itself, does not create a question of fact regarding racial animus or pretext. *Wellons v. Miami Dade County*, 611 Fed. Appx. 535, 539 (11th Cir. 2015) ("An isolated, discriminatory comment that is unrelated to the challenged employment decision can contribute to a circumstantial case of pretext, but it is insufficient to establish a material issue of pretext by itself.") (citing *Rojas v. Florida*, 285 F.3d 1339, 1342-43 (11th Cir. 2002)).

The Court has considered Mr. Butler's evidence for each of his arguments not only individually but also in combination. Even in combination, Mr. Butler's evidence does not create a question of fact regarding pretext. Considering the circumstantial evidence of racially-motivated conduct and discrimination by MBUSI in the light most favorable to Mr. Butler, the Court finds that the evidence does not create a question of fact regarding discriminatory intent.

      6.   <u>Statistical evidence of discrimination</u>

Mr. Butler also presents statistical evidence to support his discrimination claim. (Doc. 49, pp. 8-9, 12-13, 21). "Statistical evidence is an appropriate method for demonstrating both a prima facie case of discrimination and pretext." *Brown v. American Honda Motor Co., Inc.*, 939 F.2d 946, 952 (11th Cir. 1991). (citations omitted).

Mr. Butler submitted evidence that, in a two-year period between September 2012 and September 2014, MBUSI promoted forty-four employees to a group leader position in the Vance, Alabama production facility, and only seven, or 16%, of the employees promoted to group leader were African-American. (Doc. 48-2).[26] "Statistics such as these, however, without an analytic foundation, are virtually meaningless." *Brown*, 939 F.2d at 952 (citing *Wards Cove Packing Co., v. Atonio*, 490 U.S. 642 (1989)). Generally speaking, "[t]o say that very few [African-Americans] have been selected by [MBUSI] does not say a great deal about [MBUSI's] practices unless we know how many [African-Americans] have applied and failed and compare that to the success rate of equally qualified [Caucasian] applicants." *Brown*, 939 F.2d at 952. Here, the Court takes into account evidence that MBUSI's review practices dissuaded African-American team leaders from applying for group leader positions.

Still, Mr. Butler did not submit evidence to show how many team leaders MBUSI employs, how many of MBUSI's team leaders are African-American, and how many African-American team leaders applied for group leader positions between September 2012 and September 2014. (*See* Docs 48 & 49). In addition, Mr. Butler did not introduce any evidence about the "racial composition of the

---

[26] In his opposition to MBUSI's motion, Mr. Butler asserts that MBUSI promoted nine African-American employees to a group leader position between September 2012 and September 2014. (Doc. 49, p. 8). However, the document he cites to support that assertion reflects that only seven African-American employees became group leaders between September 20, 2012 and September 12, 2014. (*See* Doc. 48-2).

pool of qualified applicants" for team leader or group leader positions in order to compare it with the racial composition of those hired for the positions, which "is one of the appropriate statistical methods for demonstrating intentional discrimination." *Miles v. M.N.C. Corp.*, 750 F.2d 867, 872 (11th Cir. 1985) (citation omitted). Thus, Mr. Butler has not provided sufficient context for his argument, and evidence that only seven of the forty-four team leaders promoted to group leader positions were African-American does not create a question of fact regarding discrimination against African-Americans in promotion practices. *See Brown*, 939 F.2d at 952 (finding that statistics showing that "out of approximately 860 Honda dealers nationwide only two are black" are insufficient by themselves to show pretext in a § 1981 case).

## IV. CONCLUSION

For the reasons discussed above, the Court **GRANTS IN PART** and **DENIES IN PART** MBUSI's motion to strike (Doc. 52), and the Court **GRANTS** MBUSI's motion for summary judgment. (Doc. 40).

**DONE** and **ORDERED** this March 26, 2018.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE